**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| **SCOTT REEDER and the ILLINOIS POLICY INSTITUTE,** | ) | |
| | ) | |
| | ) | **No. 3:14-cv-03041** |
| **Plaintiffs,** | ) | |
| | ) | **Judge Bruce** |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. MADIGAN, et al.,** | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION OR PERMANENT INJUNCTION**

I.      **Introduction**

Plaintiff Scott Reeder has been a full-time professional journalist for nearly 26 years.

Since 2012, he has worked full-time as a journalist for the Illinois News Network, a project of

Plaintiff Illinois Policy Institute ("IPI"), covering Illinois state and local government and public

policy. His weekly column for the Illinois News Network reaches hundreds of thousands of

readers across the state, and his news articles for the Illinois News Network are also published in

newspapers statewide.

For more than a decade, Defendants (and/or their predecessors in office) gave Mr. Reeder

access to the Illinois House and Senate press facilities. After he joined the Illinois News

Network, however, Defendants refused to grant him media credentials because, they said, IPI

was a lobbying organization.

This lawsuit seeks to protect Mr. Reeder's First Amendment right to have the same

access to news that Defendants accord to other journalists. Defendants' exclusion of Mr. Reeder

from their press facilities based on his employer's other activities is not the least restrictive means of serving a compelling governmental interest and therefore violates his right to freedom of the press under the First and Fourteenth Amendments. Because this violation of his First Amendment rights is causing him irreparable harm, Mr. Reeder seeks a preliminary or permanent injunction ordering Defendants to grant him access to the House and Senate press facilities.[1]

## II.      Statement of Facts

**Press Facilities in the Illinois House and Senate**

The Illinois House of Representatives ("House") and Illinois Senate ("Senate") both have press boxes on their respective chambers' floors. (Verified Compl. ¶ 10.) Access to these press boxes gives journalists certain advantages they would not otherwise have. (*Id.* ¶ 11.) For example, access to the press box allows a journalist to:

- Participate in impromptu press conferences often held by lawmakers at the front of the press boxes during each legislative day;

- Use seats and desks that allow them to take notes;

- Take photographs from an advantageous position;

- Receive press releases, transcripts of speeches, and staff analyses of bills that are routinely distributed to journalists in the press boxes;

---

[1] Mr. Reeder's complaint also states additional claims under the Due Process Clause and Equal Protection Clause of the Fourteenth Amendment that are not addressed in this motion.

- Use the services of pages who can deliver interview requests to legislators on the floor; and

- Have a guaranteed seat in the legislative chambers on days when the public galleries are full.

(*Id.*) House and Senate committee rooms also have press tables that give journalists a place to sit and take notes, receive drafts and staff analyses of legislation, and use audio jacks that provide broadcast-quality audio of the committee proceedings. (*Id.* ¶ 12.)

Defendants routinely give press access to journalists from a wide range of media outlets, including newspapers, television and radio stations, news services, and websites. (*Id.* ¶ 13.)

**Restrictions on Access to Press Facilities**

Defendants do not, however, give all journalists access. Some, such as Plaintiff Scott Reeder, are excluded by Defendants' application of the Illinois Lobbyist Registration Act ("LRA"), the House and Senate Rules, and the Senate Media Guidelines for the 98th General Assembly. (*Id.* ¶ 14.)

The LRA requires individuals and organizations that directly or indirectly lobby the state government to register with the Illinois Secretary of State. 25 ILCS 170/3(a). But the LRA exempts certain news organizations and journalists from this registration requirement – specifically, "[p]ersons or entities who own, publish, or are employed by a newspaper or other regularly published periodical, or who own or are employed by a radio station, television station, or other bona fide news medium that in the ordinary case of business disseminates news, editorial or other comment, or paid advertisements that directly urge the passage or defeat of legislation." 25 ILCS 170/3(a)(2). The LRA, however, also excludes certain organizations and

journalists from this exemption – specifically, any individual who "receives additional compensation or expenses from some source other than the bona fide news medium for the purpose of influencing executive, legislative, or administrative action" and any "newspapers or periodicals owned or published by trade associations and not-for-profit corporations engaged primarily in endeavors other than dissemination of news." *Id.*

The House Rules, in turn, prohibit anyone who is required to register as a lobbyist under the LRA from having access to the House floor when the House is in session. *See* House Rule 30(d) (Compl. Exhibit 1). The Senate Rules likewise prohibit individuals required to register under the LRA from having access to the Senate floor. *See* Senate Rule 4-3(d) (Compl. Exhibit 2).

Thus, as applied by Defendants, the LRA and the House and Senate Rules operate together to bar certain journalists from the House and Senate floors and thus from the House and Senate press boxes – i.e., those journalists who are employed by "not-for-profit corporations engaged primarily in endeavors other than dissemination of news" that are classified as lobbying organizations and required to register as such.

On the other hand, journalists employed by for-profit news organizations that lobby – or non-profit organizations that lobby but "primarily" disseminate news – are *not* barred from the House and Senate floors and press facilities. Thus, for example, *Chicago Tribune* reporters have had access to the House and Senate press facilities even in years when the *Tribune*'s owner, the Tribune Company, was registered as a lobbying entity (as it was in 2000) or hired a firm to lobby state government on its behalf (as it did in 2002 and 2003). (Compl. ¶ 22, Exhibit 3.)

In addition, the Senate Media Guidelines further restrict which journalists may receive Senate media credentials and thus have access to the Senate press facilities. Paragraph 3 of the Guidelines requires that the news organization employing a journalist "be owned and operated independently of any industry, institution association, or lobbying organization" and that the journalist "operate independently of any industry, or institution" and not engage in any lobbying. (Compl. ¶ 24, Exhibit 4.)

**Plaintiff Scott Reeder and the Illinois News Network**

Plaintiff Scott Reeder is a journalist for the Illinois News Network, a news service that provides news articles related to issues of state government and public policy to newspapers across the state. (*Id.* ¶ 25.) In a typical month, 60 to 80 newspapers across the state publish news articles and columns by Mr. Reeder and other Illinois News Network journalists. (*Id.* ¶ 26.) In the past year alone, the Illinois News Network served 109 newspapers with an aggregate circulation of more than one million. (*Id.* ¶ 27.) In fact, many of these papers lack statehouse reporters of their own and rely on the Illinois News Network for news reporting on state government. (*Id.* ¶ 28.) Mr. Reeder also writes a weekly "Reeder Report" e-newsletter, which contains additional news and commentary on Illinois government and public policy. (*Id.* at ¶ 29.)

The Illinois News Network is a project of the Illinois Policy Institute ("IPI"), which is a non-partisan 501(c)(3) non-profit organization that advocates public policies that advance personal and economic liberty in Illinois. (*Id.* ¶ 30.) IPI's work apart from the Illinois News Network includes publishing research related to public policy issues affecting Illinois. (*Id.* ¶ 31.)

Mr. Reeder's work for the Illinois News Network, which began in 2012, is only the latest chapter in a journalism career that has spanned nearly 26 years. (*Id.* ¶ 32.) He earned a bachelor's

degree in journalism and mass communications from Iowa State University in 1987 and a master's degree in public-affairs reporting from Sangamon State University (now the University of Illinois at Springfield) in 1988. (*Id.* ¶ 33.) In 1988, he was hired as a reporter for the *Galveston* (Texas) *Daily News*; he later moved to the *Quad-City Times* of Davenport, Iowa, and then became a senior reporter for the *Las Vegas Sun*. (*Id.* ¶ 34.) From 1999 to 2009, he was Statehouse Bureau Chief for SNG newspapers, a group of four mid-sized newspapers in Illinois, and reported on Illinois state government. (*Id.* ¶ 35.) From 2009 to 2012, he was National Statehouse Managing Editor for the Franklin Center for Government and Public Integrity, where he continued to report on Illinois state government, oversaw 14 full-time reporters and editors in 10 states, and spearheaded the creation of a national service that provided news content to 135 daily newspapers, more than 100 radio stations, and 14 television broadcasters in seven states. (*Id.* ¶ 36.) Mr. Reeder continues to work for the Franklin Center as an independent contractor, and his writing on Illinois state government frequently appears on the Franklin Center's website, Watchdog.org. (*Id.* ¶ 37.)

**Defendants' Denial of Press Credentials**

For each year from 1999 through 2012, Mr. Reeder was granted access to the House and Senate press facilities so he could cover the proceedings of the Illinois General Assembly. (*Id.* ¶ 38.) In late 2012 or January 2013, Mr. Reeder requested media credentials from the Illinois House and Senate for 2013. (*Id.* ¶ 39.)

In March 2013, he received a letter from Defendant Rikeesha Phelon, Press Secretary for the Office of the Senate President, denying his request for Senate credentials. (*Id.* ¶ 40, Exhibit 5.) To justify her denial of Mr. Reeder's application, Ms. Phelon observed that IPI was registered

as an Illinois lobbying entity for 2013 and cited the above-referenced provisions of the LRA, Senate Rule 4-3(d), and the Senate Media Guidelines for the 98th General Assembly. (*Id.* ¶ 41, Exhibit 5.)

Mr. Reeder never received a written response to his 2013 request for House media credentials. (*Id.* ¶ 42.) Defendant Steve Brown, Press Secretary to the Office of the Speaker of the House, informed him verbally that the House would not grant him media credentials for 2013 because he was employed by IPI. (*Id.* ¶ 43.)

In January 2014, Mr. Reeder again applied for media credentials from the House and Senate. (*Id.* ¶ 44.) In letters to Defendants Brown and Phelon, Mr. Reeder's counsel explained that IPI had not registered and would not register as a lobbying organization in 2014, so that purported basis for denying Mr. Reeder's 2013 applications no longer applied. (*Id.* ¶ 45, Exhibit 6.)

Nonetheless, on January 16, 2014, Defendant Cullerton's counsel, Eric Madiar, sent Mr. Reeder a letter denying his Senate application based on Mr. Madiar's belief that IPI was still required to register as a lobbying organization, citing the LRA, Senate Rule 4-3(d), and Senate Media Guidelines Paragraph 3. (*Id.* ¶ 46, Exhibit 7.)

On February 3, 2014, Defendant Madigan's counsel, Heather Wier Vaught, sent Mr. Reeder's counsel a letter stating two purported bases for denying his 2014 application. (*Id.* ¶ 47, Exhibit 8.) The first basis was that Mr. Reeder is not a "representative of the press" because IPI "is neither a press nor a media organization." (*Id.* ¶ 48, Exhibit 8.) The letter identified no law or rule, however, defining "press" and "media organization" and cited no standard it applies in

making this determination. (*Id.* ¶ 48.) The second basis was Ms. Vaught's belief that IPI is a lobbying organization even though it had not registered under the LRA. (*Id.* ¶ 49.)

In fact, Mr. Reeder has never engaged in any lobbying for IPI or any other organization. (*Id.* ¶ 50.) Indeed, Defendants have never accused him of personally lobbying legislators or other state officials. (*Id.* ¶ 51.) Mr. Reeder is and always has been a journalist, not a lobbyist. (*Id.* ¶ 52.)

Although Defendants have refused to grant Mr. Reeder press credentials, other governmental bodies have granted him credentials. (*Id.* ¶ 53.) In January 2014, for example, Mr. Reeder received press credentials from the Illinois Secretary of State, which allow him access to areas of the Illinois statehouse other than the House and Senate floors, and from the United States Supreme Court. (*Id.* ¶ 54.)

**This Lawsuit**

Mr. Reeder has filed this lawsuit to challenge Defendants' refusal to grant him access to the House and Senate press facilities as a violation of his right to freedom of the press under the First and Fourteenth Amendments. With this motion, he seeks a preliminary or permanent injunction to give him the access to which he is entitled.

**III.    Standard of Review**

To prevail on a motion for preliminary injunction, Plaintiffs must demonstrate: (1) a likelihood of success on the merits; (2) the lack of an adequate remedy at law; and (3) irreparable harm if the Court does not grant the injunction. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If these conditions are met, the Court must then balance the hardship the moving party will suffer in the absence of relief to any hardship the nonmoving parties will suffer if the

injunction is granted. *Id.* Finally, the Court considers the interests of nonparties in deciding whether to grant injunctive relief. *Id.* The Court weighs all these factors using a "'sliding scale' approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards his side; the less likely it is the plaintiff will succeed, the more the balance need weigh toward his side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

Similarly, to prevail on a motion for a permanent injunction, a plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## IV.    Argument

Defendants' arbitrary discrimination against Mr. Reeder based on his employer's status as a non-profit organization that also engages in other activities violates his First Amendment right to freedom of the press. Defendants' refusal to allow Mr. Reeder access to the House and Senate press facilities is therefore causing him irreparable harm, and this Court should therefore issue an injunction to grant him immediate access.

**A. Mr. Reeder is likely to succeed on the merits because Defendants' application of the Lobbyist Registration Act, House Rules, and Senate Rules is depriving him of his First Amendment right to freedom of the press.**

Mr. Reeder is likely to succeed on the merits of his claims against Defendants because the First Amendment prohibits the state from denying a journalist equal access to news based on his or her employer's non-profit status and advocacy on issues of public policy.

**1. The First Amendment right to freedom of the press includes a journalist's right to equal access to government press facilities regardless of the type of organization that employs him or her as a journalist.**

Courts have universally recognized that the First Amendment right to freedom of the press includes a right of journalists to have equal access to governmental sources of news. And where the government makes press facilities "publicly available as a source of information for newsmen, the protection affording newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977) (internal footnote and citations omitted); *see also Anderson v. Cryovac, Inc.*, 805 F.2d 1, 9 (1st Cir. 1986) (government "may not selectively exclude news media from access to information otherwise made available for public dissemination"); *Am. Broadcasting Cos., Inc. v. Cuomo*, 570 F.2d 1080, 1083 (2d Cir. 1977) ("[O]nce there is a public function, public comment, and participation by some of the media, the First Amendment requires equal access to all of the media . . . ."); *United Teachers of Dade v. Stierheim*, 213 F. Supp. 2d 1368, 1374 (S.D. Fla. 2002) (exclusions from press room violated right of access); *Westinghouse Broadcasting Co. v. Dukakis*, 409 F. Supp. 895, 896 (D. Mass. 1976) ("All representatives of news organizations must not only be given equal access, but within reasonable limits, access with equal convenience to official news sources."); *Borreca v.*

*Fasi*, 369 F. Supp. 906, 909 (D. Haw. 1974) (First Amendment right of access to news includes "a right of access to the public galleries, the press rooms, and the press conferences dealing with government"); *Lewis v. Baxley*, 368 F. Supp. 768, 777 (M.D. Ala. 1973) (First Amendment right of access extends "to places where other members of the press may go and congregate in the ordinary course of events [such as] the public galleries, the press rooms, and the press conferences dealing with state government").

This rule is important because when the government unreasonably denies a journalist access to sources of news, it effectively decides who will be allowed to speak on matters of public importance and thus affects the *content* of the news in violation of fundamental First Amendment principles. "The danger in granting favorable treatment to certain members of the media is obvious: it allows the government to influence the type of substantive media coverage that public events will receive. Such a practice is unquestionably at odds with the first amendment." *Anderson*, 805 F.2d at 9. "Manipulation of the news [by political officeholders] is a highly developed technique . . . . Hand-picking those [journalists] in attendance [at government events] intensifies the manipulation." *Borreca*, 369 F. Supp. at 910; *see also United Teachers*, 213 F. Supp. 2d at 1374 ("Access to news, if unreasonably or arbitrarily denied . . . , constitutes a direct limitation upon the content of news.") (quoting *Consumers Union of U.S., Inc. v. Periodical Correspondents' Ass'n*, 365 F. Supp. 18, 26 (D.D.C. 1973), *rev'd on other grounds*, 515 F.2d 1341 (D.C. Cir. 1975)).

Accordingly, the high level of scrutiny that applies to government restrictions on the content of speech – i.e., strict scrutiny – applies to restrictions on journalists' equal access to news. The state may only deny particular journalists access to press facilities if doing so serves a

compelling governmental interest and is the least restrictive reasonable means of serving that purpose. *Borreca*, 369 F. Supp. at 909; *Consumers Union*, 365 F. Supp. at 25 (citing *Shelton v. Tucker*, 364 U.S. 479, 488 (1960)).

Applying these principles, federal courts have struck down discriminatory restrictions that excluded certain journalists from press facilities. In *Consumers Union*, for example, the court struck down a rule that excluded from the Congressional press galleries any journalists employed by organizations that were not "owned and operated independently of any industry, business, association, or institution" because it violated the First Amendment principle that "[a]ll types of publications are entitled to an equal freedom to hear and publish the official business of the Congress." 365 F. Supp. at 25-27. Thus, a journalist from *Consumer Reports* could not be excluded from the Congressional press galleries even though it was published by a consumer advocacy group. Although the Court of Appeals vacated the trial court's decision in *Consumers Union* on the basis of the political question doctrine, 515 F.3d at 1347, other federal court decisions – including one from the same Court of Appeals – have approved and applied the trial court's holding on the merits where the political-question doctrine was not a bar. *See, e.g., Sherrill*, 569 F.2d at 129 n.17; *United Teachers*, 213 F. Supp. 2d at 1372-73; *Lewis*, 368 F. Supp. at 776-77.

In *Lewis*, the court struck down an Alabama statute that denied journalists access to the state House and Senate press facilities unless they filed a "statement of economic interest" including "names of all newspapers or publications, radio stations, or news-gathering organizations by which they are employed, and what other occupations or employment they may have, if any" and a declaration "that they are not employed, directly or indirectly, by any person

or corporation having legislation before the State Legislature, and that they will not become so engaged in any of these activities while covering the State Legislature or state government." 368 F. Supp. at 772-73. The court held that the statue lacked any substantial relationship to any compelling governmental interest. The state could not force journalists to provide disclosures "upon the theory that one or more . . . may be lobbyists," even if it could have imposed rules to "ferret out genuine lobbyists among newsmen, if such exist," to prevent them from surreptitiously lobbying legislators. *Id.* at 779-80.

In *United Teachers*, the court enjoined enforcement of a school board rule that limited use of its press facilities to "individuals employed by a newspaper or broadcast organization intended for general circulation" and specifically excluded reporters for any "newspaper intended primarily for members of a particular profession or occupation" and "anyone employed by the various labor unions in any capacity including those who work for union publications." 213 F. Supp. 2d at 1371-76. The court ruled that the exclusion of "particular-profession" and union publications was effectively a content-based restriction and did not appear to bear a substantial relationship to the board's interest in controlling disruptions and addressing space limitations. *Id.* at 1373, 1375.

> **2.** **Defendants' exclusion of Mr. Reeder from House and Senate press facilities violates his First Amendment right to equal access.**

In light of the foregoing principles, Defendants' exclusion of Mr. Reeder from the House and Senate press facilities violates his First Amendment right of access to news as a journalist.

a.  **The Lobbyist Registration Act, House Rule 30(d), and Senate Rule 4-3(d) violate the First Amendment on their face and as applied to Mr. Reeder.**

As described in detail above, Defendants apply the LRA, House Rule 30(d), and Senate Rule 4-3(d) in a manner that discriminates against journalists employed by certain not-for-profit organizations – i.e., those that are not "primarily" engaged in the dissemination of news. This discrimination, particularly as applied to Mr. Reeder, is irrational and is not the least restrictive means of serving a compelling a governmental interest, and it therefore violates Mr. Reeder's First Amendment right to freedom of the press. Indeed, Defendants' exclusion of Mr. Reeder is substantially identical to the exclusion of reporters from a consumer-advocacy group that the court condemned in *Consumers Union* and the exclusion of reporters from a teachers-union publication condemned in *United Teachers*.

Defendants' discrimination cannot be justified on the basis that it is necessary to prevent surreptitious lobbying of legislators on the House and Senate floors. If Defendants were actually concerned about journalists engaging in lobbying, they would bar *all* journalists whose employers lobby, not just those employed by non-profit organizations such as IPI.[2] The journalists who Defendants allow in the press facilities – even if their employers lobby – are no less capable of surreptitiously lobbying that the journalists who are excluded. There is no rational

_____

[2] That is, the law's underinclusiveness demonstrates that it does not actually serve this purpose. *See City of Ladue v. Gilleo*, 512 U.S. 43, 52-53 (1994) (underinclusiveness "diminish[es] the credibility of the government's rationale for restricting speech"); *Florida Star v. B.J.F.*, 491 U.S. 524, 541-42 (1989) (Scalia, J., concurring) ("[A] law cannot be regarded as protecting an interest of the highest order, and thus as justify a restriction upon . . . speech, when it leaves appreciable damage to that supposedly vital interest unprohibited.") (internal marks and citations omitted).

basis for – let alone a compelling governmental interest in – singling out journalists who happen to be employed by a particular type of non-profit organization for exclusion.

Also, in any event, selectively excluding journalists from certain non-profit organizations is plainly not the least restrictive means of ensuring that lobbyists stay off the House and Senate floors. One less restrictive means of achieving that goal would be to impose rules designed to keep *actual lobbyists* off the House and Senate floors – for example, by prohibiting *individuals* who are registered as lobbyists from receiving press credentials.

Defendants' discrimination against Mr. Reeder and others employed by certain non-profit organizations affects the content of the news that will be available to the public. Mr. Reeder and Illinois News Network write from a perspective that favors free markets and limited government – a perspective they believe is insufficiently represented in state media outlets. (Compl. ¶ 31.) Restricting Mr. Reeder's access prevents him from disseminating news that reflects his perspective on the issues that are important for Illinois citizens to know about and favors the perspective of other media organizations – and thus undermines the fundamental First Amendment principle that "the right conclusions are more likely to be gathered out of a multitude of tongues rather than through any kind of authoritative selection." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967) (quoting *United States v. Associated Press*, 52 F. Supp. 367, 372 (S.D.N.Y. 1943) (L. Hand, J.)). Moreover, denying Mr. Reeder access will also deprive the newspapers across the state without statehouse correspondents of their own, and which rely on Mr. Reeder's reporting, from having a reporter inside the House and Senate press boxes. (Compl. ¶ 28.)

Through their respective counsel, Defendants have implied that excluding Mr. Reeder from the House and Senate press facilities causes him no real First Amendment injury because he can nonetheless have access to the public galleries. (*See* Compl. Exhibits 7, 8.) But courts considering similar First Amendment challenges have consistently held that giving journalists who have been excluded from press facilities access to the public galleries does not satisfy the First Amendment because the journalists who are given access to press facilities still have an advantage over those who are not. *See United Teachers*, 213 F. Supp. 2d at 1373 & n.2 (exclusion from press room "constitutes denial of access to information even if the Plaintiffs are allowed entry into the auditorium or given access to another media room"); *Consumers Union*, 365 F. Supp. at 25 (argument that excluded journalists "may gain access to news concerning congressional activities by using the public galleries and other resources available . . . wholly without merit"); *Kovach v. Maddux*, 238 F. Supp. 835, 841, 845 (M.D. Tenn. 1965) (access to state senate press facilities "gives direct, immediate, and effective access to an important and vital source of state news . . . which could not be materially alleviated . . . by access to the Senate gallery").

Accordingly, Defendants' application of the LRA, House Rule 30(d), and Senate Rule 4-3(d) to exclude Mr. Reeder from the House and Senate press facilities violates his First Amendment right to freedom of the press, and Mr. Reeder his likely to succeed on the merits of his First Amendment claims.

**b.    The Senate Media Guidelines violate the First Amendment on their face and as applied to Mr. Reeder.**

In denying Mr. Reeder's applications for press credentials, the Senate also relied upon its Senate Media Guidelines. (Compl. ¶¶ 41, 46; Exhibits 5, 7.) These also violate the First Amendment on their face and as applied to Mr. Reeder.

The Guidelines deny media credentials to any journalist whose employer is not "owned and operated independently of any industry, institution, association, or lobbying organization." This restriction violates the First Amendment because there is no rational basis for – let alone a compelling governmental interest served by – discriminating against journalists based on the types of organizations that employ them. Indeed, the rule is nearly identical to the one condemned for that reason in *Consumers Union*. 365 F. Supp. at 22 (rule barred journalists from organizations not "owned and operated independently of any industry, business, association, or institution").

Moreover, the Guidelines' criteria are vague and arbitrary and thus violate the First Amendment as well as basic principles of due process. *See Consumers Union*, 365 F. Supp. at 26 (unconstitutional criteria created "indefinite standards and artificial distinctions"); *see also Sherrill*, 569 F.2d at 130 (rejecting "reasons of security" as an "unnecessarily vague," "ambiguous" basis for excluding journalist from White House press facilities).

It is unclear what it means for a publication to be owned and operated independently of an "industry," "institution," or "association." Taken literally, this language would appear to bar journalists from *any* publications that are part of a larger organization – for example, newspapers such as the *Chicago Tribune*, which, at least until recently, was owned by the Tribune Company, which for many years has engaged in numerous businesses unrelated to newsgathering, such as

the website CareerBuilder.com[3] and, previously, the Chicago Cubs.[4] But of course Defendants Cullerton and Phelon have not applied the Guidelines literally, but have instead selectively applied them to exclude Mr. Reeder. Thus, the Guidelines' criteria not only are irrational but also, by their vagueness, empower Defendants to arbitrarily, selectively deny press credentials to certain journalists. Accordingly, the Guidelines violate the First Amendment both on their face and as applied to Mr. Reeder.

        **c.**       **Defendants Madigan and Brown's denial on the basis that IPI is not a "press or media organization" is arbitrary, unreasonable, and violates Mr. Reeder's First Amendment rights.**

Defendants Madigan and Brown's denial of Mr. Reeder's 2014 application for House press credentials on the basis that IPI is "not a press or media organization" is arbitrary and unreasonable and therefore also violates Mr. Reeder's First Amendment rights.

Defendants' denial did not dispute that Mr. Reeder is a journalist or that his news articles in commentary are published in many newspapers across the state and reach hundreds of thousands of readers. Instead, their letter cited other activity of IPI and concluded that IPI is not a "press or media organization." IPI's activities apart from Mr. Reeder's journalism work are, however, irrelevant – just as the consumer advocacy group's non-journalism activities were

---

[3] *See* Robert Channick, *Tribune Co. to Spin Off Newspapers*, Chi. Trib., July 10, 2013, http://articles.chicagotribune.com/2013-07-10/business/chi-tribune-co-newspapers-20130710_1_tribune-co-tribune-studios-times-mirror-co.

[4] *See* Todd Lighty & Robert Becker, *Blagojevich's Secret Talks with Tribune Co.*, Chi. Trib., Mar. 31, 2009, http://www.chicagotribune.com/news/local/chi-tribune-blagojevich-31-mar31,0,1800835,full.story.

irrelevant in *Consumers Union*, and just as the teachers union's other activities were irrelevant in *Teachers United.* "All types of news compete and all types of publications are entitled to hear and publish the official business of the [legislature]." *Consumers Union*, 365 F. Supp. at 26 (citing *Quad-City Community News Service, Inc. v. Jebens*, 334 F. Supp. 8 (S.D. Iowa 1971) (requiring city government to grant press access to "underground newspaper")). Moreover, Defendants' determination appears to be entirely arbitrary because they have cited no law or rule that defines "press or media organization." (Compl. ¶ 48.) Accordingly, their denial of Mr. Reeder's application on this basis violated his First Amendment rights as well as his due process rights. *See Sherrill*, 569 F.2d at 129 (defendants required to "publish or otherwise publicly make known the actual standard employed" in granting or denying White House press passes).

**B.      Plaintiff lacks an adequate remedy at law and will suffer irreparable harm unless the Court grants a preliminary or permanent injunction allowing him access to the House and Senate press boxes.**

Defendants' refusal to give Mr. Reeder access to the House and Senate press facilities has caused and will continue to cause him irreparable harm. It is well-established that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *Elrod v. Burns*, 427 U.S. 347, 373 (1976), and monetary damages are therefore inadequate to compensate for it, *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). Because Defendants' conduct violates Mr. Reeder's First Amendment rights, as discussed above, it necessarily causes him irreparably injury for which he lacks an adequate remedy at law.

**C.      The balance of hardships favors granting an injunction.**

The balance of hardships overwhelmingly favors granting an injunction to allow Mr. Reeder access to the House and Senate press facilities. As discussed above, if Mr. Reeder remains barred from the press facilities, he will be severely disadvantaged in his ability to report on the state legislature, harming both his First Amendment rights and his ability to engage in his lawful occupation. Defendants, in contrast, will suffer no cognizable hardship; the General Assembly will be able to conduct its business as always, just as it does when journalists from for-profit news organizations that lobby are in the press facilities and just as it did during the many years when Mr. Reeder was allowed in the press facilities. *See United Teachers*, 213 F. Supp. 2d at 1376 (noting in balance-of-hardships analysis that the excluded journalist had "covered meetings from the press rooms for 20 years").

**D.      The public interest favors granting an injunction.**

The public interest also overwhelmingly favors granting an injunction. "Not only newsmen and the publications for which they write, but also the public at large have an interest protected by the first amendment in assuring that restrictions on newsgathering be no more arduous than necessary, and that individual newsmen not be arbitrarily excluded from source of information." *Sherrill*, 569 F.2d at 129-30. Indeed, "it is always in the public interest to protect First Amendment liberties." *Joelner*, 378 F.3d at 620 (internal marks and citations omitted).  In this instance, the public benefits from having Mr. Reeder's voice added to the others that report and comment on state news from the House and Senate press boxes. Members of the public in areas served by newspapers that rely on Mr. Reeder for reporting on state news also benefit because they get news they would otherwise not receive.

**V.      Conclusion**

For all of these reasons, Plaintiff Scott Reeder respectfully requests that this Court enter a

preliminary or permanent injunction ordering Defendants to allow Mr. Reeder access to the press

facilities of the Illinois House of Representatives and Senate.

Dated: February 4, 2014.

Respectfully Submitted,

/s/ Jacob H. Huebert
Jacob H. Huebert (6305339)
Attorney for Plaintiffs Scott Reeder and the
Illinois Policy Institute

Liberty Justice Center
190 S. LaSalle Street, Suite 1630
Chicago, Illinois 60603
(312) 263-7668
jhuebert@libertyjusticecenter.org

## CERTIFICATE OF SERVICE

I, Jacob H. Huebert, an attorney, hereby certify that on February 5, 2014, I will place the foregoing memorandum in support of Plaintiffs' motion for preliminary or permanent injunction with a process server for personal service upon Defendants on that day at their respective state offices:

Rep. Michael J. Madigan                    Sen. John Cullerton
300 Capitol Building                        327 Capitol Building
Springfield, Illinois 62706                 Springfield, Illinois 62706


Steve Brown                                 Rikeesha Phelon
300 Capitol Building                        313 Capitol Building
Springfield, Illinois 62706                 Springfield, Illinois 62706


/s/ Jacob H. Huebert
Jacob H. Huebert